*62 OPINION OF THE COURT
Edward J. Greenfield, J.
On December 11, 1970, at 2 p.m., a tremendous gas explosion ripped apart the three-story commercial building at 7-11 Ann Street, running through to Park Row, across from City Hall in lower Manhattan. The building blazed fiercely, and within minutes the remaining walls, ceilings and floors had collapsed. Many people were on the premises at the time, in the stores, shops, bar and restaurant. Twelve people were killed in the explosion, scores injured, and the businesses conducted on the premises were wiped out.
Forty-three separate actions were commenced as a result, against various defendants, and they were all consolidated for trial on the issue of liability. The matter was tried in 1974 by Mr. Justice Spiegel and a jury, resulting in a verdict on liability against Schlink and Bold, the plumbers who had installed a new gas piping system for the restaurant, the City of New York and the Consolidated Edison Company. Complaints were dismissed as to other named defendants, except China Dynasty Enterprises, Inc., which had operated a restaurant on the premises, and which had defaulted. The liability was apportioned 65% for the City of New York, 10% for Consolidated Edison, 121A% for Schlink and 12Vi% for Bold.
On appeal, the Appellate Division, concluding the court’s charge to the jury had been erroneous, modified the judgment to the extent of directing a new trial on the issue of the liability of the City of New York, affirmed , as to the liability of the other defendants, and directed a new apportionment of damages as to all defendants liable, including the defaulting defendant China Dynasty Enterprises, Inc. (Gannon Personnel Agency v City of New York, 57 AD2d 538).
On the second trial, tried before me with a jury, the jury again found liability on the part of the City of New York, and having heard all the evidence, apportioned liability 80% against China Dynasty, 11% against Schlink, 1% against Bold, 4% against Consolidated Edison and 4% against the City of New York. The City of New York has moved to set aside the jury’s verdict finding it liable and fixing its responsibility at 4%; the plumbers Schlink and Bold moved to set the verdict aside insofar as it allocates 11% and 1% of the responsibility to them. The court denied the latter motion from the Bench, but has reserved decision until now on the city’s motion.
*63 Although the responsibility of the city and of Consolidated Edison has been fixed at 4% each, in actuality they are being called upon to bear the brunt of whatever damages are ultimately assessed, because the principal tort-feasor, China Dynasty, is defunct, uninsured, and almost certainly unable to respond even in part to any judgment. The plumbers, Schlink and Bold, have a limited amount of liability coverage and no substantial assets of their own. That means, since each tortfeasor is fully liable to the plaintiffs despite apportionment inter se, that of the potential damages which can run into many millions of dollars, the apportionment fixed by the jury, if it stands, will really result in the city and Consolidated Edison, as joint tort-feasors, paying virtually 50% each of the final judgments.
The basic contention of the city on this motion to set aside the jury’s verdict as to it, is that a municipality cannot be held liable for failure to enforce a statute or regulation, absent some special relationship to those claiming to be injured by its alleged dereliction of duty, relying on Motyka v City of Amsterdam (15 NY2d 134, 139). Obviously, with laws, codes and regulations on the books enough to stuff a good sized library, a municipality is not to be held liable every time one of its many inhabitants claims that had the law been properly enforced, the injury would not have occurred. Certainly, a municipality is not to be held liable if a crime is committed against a person which could have been prevented had a policeman been on the scene. It cannot be an insurer which is answerable every time a health or safety regulation has not been complied with, and injury ensues. But a municipality is not absolved of all responsibility whenever a wrong has been committed by another. The inquiry in this case must be into the nature of the special relationship and the unique duty which will, in fact, cast a municipality in liability. What was it which caused this catastrophic gas explosion, and led two juries to conclude that the city was responsible as a joint tort-feasor?
The building at 7-11 Ann Street, also facing on Park Row, had been erected as a one-story motion picture theater in 1913. In 1921, it was expanded to three stories, and eventually the theater was replaced by stores and an upstairs billiard parlor. In 1969, application was made to convert the second and third floors to a restaurant. Its cooking needs necessitated expanded gas service to the building, for which plans were *64 filed and an application duly made. The old one and one-half inch gas line servicing the building from the street main was to be discontinued and a new three-inch service line installed. Consolidated Edison sent a service representative to the premises to check field conditions, and it supplied the plumber working for China Dynasty on the renovations for the restaurant with a schematic diagram of the gas piping to be installed from the incoming service pipe to the meters. The city’s Department of Buildings approved the plans. The city issued a permit to dig up the street to expose the gas main, and between November 16-18, 1970 the main was tapped for a three-inch line into the building until turned on by a special key or wrench. The service pipe into the building, which branched into a T-shape inside, was also fitted with metal caps so that no gas could flow through until all the piping had been hooked up.
The Schlink Plumbing and Heating Co., Inc., was doing the work of connecting the gas pipe installation in the building. Its officers were Otto Schlink and Albert Bold. Schlink, though a plumber for 20 years and licensed in Nassau County, was not a licensed plumber in New York City. Bold was. He authorized Schlink to file applications to do plumbing work, he never once came to the premises. Schlink, working with a helper, had no experience in hooking up a new service line to meters, and had no recollection of having worked with Consolidated Edison before. In connecting the incoming service pipe to the meters, and thence to the individual tenants in the building, Schlink made two major and disastrous omissions: (1) he failed to install a shut-off valve where the service pipe entered the building, so that the flow of gas to the entire building could be controlled from one single location inside the premises, and (2) he left a gas pipe, or leader, running to the next basement room, open ended and uncapped.
In addition, there may or may not have been a gap between pipes where the new meter for the restaurant was to be installed to measure the gas flowing through. The new meter was not on hand, and Consolidated Edison agreed there could be a temporary connecting link-up there for a day or two until the meter arrived and could be installed.
Thus, unless corrective action was taken, the stage was set for disaster. Once gas was allowed to flow from the street main to the building it would inevitably leak out from any open-ended pipe, and there was no in-house shut-off valve to *65 cut the gas off once leakage was observed. But before the gas could be allowed to flow, both the city and Consolidated Edison would have had to check out the hook-up.
The city inspector for the job was one Hyman Gould. He arrived on the premises on December 2, 1970 for final inspection of the new gas pipe installation. Although he claims he made a proper inspection, he claimed he was never made aware that this was a new incoming gas service line, and that his inspection was limited only to the piping from the meter to the restaurant. There was evidence which the jury obviously chose to believe on the basis of their finding liability on the city’s part, either that he did not see or inspect what he should have, or that he saw it and despite the open-ended piping and the absence of a shut-off valve at the building’s point of intake, he told Schlink, "Good job”, and indicated the necessary blue card signifying official approval would issue. The blue card reads as follows: "This is to certify that the gas pipes of the premises known as No. 7 to 11 Ann Street in the Borough of Manhattan conforms to the rules and regulations of this department in effect at this date.”
Clearly the gas piping installation which the city inspector approved did not comply with the rules and regulations. One of the provisions of the Administrative Code of the City of New York required a shut-off valve at the head of the service, i.e., at a point within two feet of the point of entry of a gas service line into the building. (Administrative Code, RS-16, P115.2, subd [a].) There was in fact no such shut-off valve. And section C26-1606.1 of the Administrative Code required every part of a new or altered gas piping system to be inspected and tested to determine compliance with code requirements. Yet despite a mercury test he administered the city inspector failed to ascertain the existence of open-ended gas piping. Had the piping system leaked, the mercury test could have uncovered that fact. But here there was no mere potentiality for a partial gas leak. Rather, whatever gas came into the system would flow out freely from the uncapped pipe, a fact ascertainable on simple visual inspection.
Once the city inspector had approved the system, and authorized the issuance of the blue card, the proprietor of the Chinese restaurant presented it to Consolidated Edison on December 10, 1970 and arranged with it for the turn-on of the new gas system. This was to take place on Monday, December 14, 1970. At that time the Consolidated Edison people would *66 make a final and independent check of the system before turning on the gas.
Unfortunately, the final check-out on December 14 never took place. The Chinese restaurant people were requesting an immediate hook-up so they could get their operation going, and had pressed for a connection by Friday, December 11. Evidently they were too impatient to wait until after the weekend. Having been assured by the city inspector that the system was safe and ready to be hooked up, and Consolidated Edison having indicated it would approve a turn-on even in the absence of a meter, the restaurant proprietor evidently made private arrangements with somebody to turn on the gas. Shortly before 2 p.m. on December 11, a man was observed working on the sidewalk curb valve, turning it on, while another man, who fit the description of the restaurant proprietor, looked on. Shortly thereafter, various people in the building detected a strong odor of gas. The proprietor checked his stoves and found no leakage there. He took a flashlight and proceeded downstairs. Two men were in fact seen down in the basement. The gas was obviously flowing out of the open-ended pipe, and there was no inside shut-off valve to turn it off while searching for the source of the leak. One spark, and there followed explosion and conflagration — instantaneous disaster.
While Consolidated Edison’s inspection on December 14 might have averted the disaster, for their representatives testified they would never have permitted the gas service to have been turned on if they had seen the open lines and the missing shut-off valve, all of which they would have checked for, the fact was that the service was turned on by an unauthorized person at an earlier time. The first jury’s finding that Consolidated Edison was liable, which was affirmed by the Appellate Division, and the second jury’s finding that it was in pari delicto with the city, had to be predicated on the fact that its major service representative had been on the premises months earlier, that he had issued piping diagrams to the plumbers, and that on December 2, 1970 he returned to check out their work. His concern was not the piping in the interior of the premises to the gas consuming installations, but concededly it was his responsibility to supervise the piping from the main until the gas service from the street went through the meter. When he left, the uncapped leader was to be connected to a meter for the pre-existing service, and the *67 T-pipe was to be connected to a meter for the new restaurant service. If he had looked, he could not have failed to have observed that there was no shut-off valve at the point of entry. In fact, he admitted he was aware of that omission, but expected it would be rectified before service was turned on. It was the City of New York which had to give the ultimate approval to the installation and authorize the go-ahead, but it was within the utility’s power to call attention to the omissions and have the plumbers rectify them even before its final inspection at hook-up time, which would perhaps have uncovered the defects in time. The opportunity for that final inspection never arrived. The foreseeability of an accident happening through the wrongful intervention of a third person before that time was an issue of fact for the jury which was resolved against the utility. (Sawyer v Southern Cal. Gas Co., 206 Cal 366; Schmeer v Gas Light Co. of Syracuse, 147 NY 529; Hayes v Cohoes Gas Light Co., 183 App Div 182.) It has a legal responsibility to safeguard its system so that no untoward incident occurs even as a result of the culpable conduct of others. (Meizlik v Benderson Dev. Co., 51 AD2d 676; Sherman v Concourse Realty Corp., 47 AD2d 134.)
Insofar as the liability of the city is concerned, it is urged that none exists in view of the well-established legal doctrine that a municipality cannot be held liable for a mere failure to supply adequate protection through its agencies, nor for a failure of one of its inspectors to detect a violation or a danger. It is understandable that a municipality cannot be in all instances the ultimate insurer of the safety of each of its citizens. There has been an understandable judicial reluctance to impose potentially enormous financial burdens upon municipalities for failure to adequately perform each of their governmental functions, so that it has generally been held that tort liability does not arise to a particular individual who claims to have been damaged by that governmental failure. The general principle which would limit municipal and governmental liability premised upon governmental failure is highlighted by the fact that government today undertakes broad responsibilities in so many varying fields. It would be unreasonable to hold the municipality to account for some failure on its part every time a citizen is a victim of a crime, of a fire, of a building collapse or of an explosion. Theoretically omniscient and omnipotent, the municipality is, in fact, neither. It observes and it acts through the eyes and presence *68 of an always inadequate number of personnel. It cannot possibly station them every place they should be, nor can it possibly inspect every site that needs inspection.
A municipality’s primary governmental duties are to collect, to protect and to inspect. No individual has a personal cause of action against the municipality for its failure to collect taxes or fees which may be properly due from his neighbor. No municipality may be held liable for every citizen victimized by crime because police protection was stationed elsewhere. No citizen may successfully sue because damage or injury was sustained in a defective building or installation which city inspectors had not gotten around to checking it out.
This does not mean, however, that a city is totally insulated from liability and may not be answerable to an injured party for its acts of negligence in carrying out its governmental functions of inspection and protection. The Court of Appeals noted in Steitz v City of Beacon (295 NY 51) that the waiver of sovereign immunity rendered municipalities liable equally with individuals and private corporations, for the wrongs of its officers and employees. It declared (pp 54-55): "In each case, however, liability must be 'determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations’ * * * The question is whether the facts alleged would be sufficient to constitute a cause of action against an individual under the same duties as those imposed upon the city solely because of failure to protect property from destruction by fire which was started by another.” In that case, the court denied recovery for a fire loss by a four to three vote. It was alleged that the city had negligently failed to maintain a fire department nearby and to keep pressure in nearby water mains at a proper level. Despite the denial of recovery in that case, it should be noted that the court equated the duty of the municipality with that of an individual and held that the same general principles should be considered applicable.
The Restatement of Torts 2d sets forth in section 323 as hornbook law that tort liability exists when one undertakes to render service for the protection of a third person if physical harm results to the third person and (a) his failure to exercise reasonable care increases the risk of harm, or (b) the harm is suffered because of the reliance of the other or the third person on the undertaking. In this case, that would appear to *69 foreshadow liability on the part of the city because it undertook to render service (i.e., gas pipeline inspection) which was necessary for the protection of third persons, and the jury found that there was a failure to exercise reasonable care, increasing the risk of harm, and that the harm was suffered because a third person (the proprietor of the Chinese restaurant and the person he employed to turn on the gas) relied on the representation by the municipal representative that he had carried out his duties properly and found that it was safe to proceed.
The general overview of the reported cases, however, reveals that the results vary greatly. Recovery is allowed against a municipality in some cases and denied in others, with the expressed rationale for recovery or nonrecovery stressing differing bases for the decision. It is therefore necessary to examine the particular cases dealing with municipal liability for negligent failure to protect or inspect to discern the unifying theory or principle which permits recovery.
It appears clear that there is no real question as to municipal liability (1) where a governmental employee is performing an essentially nongovernmental act (i.e., driving a car, assaulting a person, maintaining its own buildings), (2) where the government itself sets the force in motion which creates harm, or itself creates the condition which causes injury, and (3) where it fails to perceive a known danger which it has the power to avoid and fails to act to abate the danger within a reasonable time (removal of snow and ice, dangerous highway design, failure to close a highway or public facility which presents an obvious danger).
In the areas of inspection and protection, however, proponents and opponents of municipal liability can find adequate authority to bolster their representative contentions. In Runkel v City of New York (282 App Div 173) and Runkel v Homelsky (286 App Div 1101, affd 3 NY2d 857), plaintiffs, infant trespassers, were buried in the debris of a three-story multiple dwelling in which they had been playing. Fifty days before the building collapsed, a city inspector of the Department of Housing and Buildings stated that he found the premises to be dangerous and unsafe, in danger of collapse and calling for demolition or securing. No further action was thereafter taken. The Appellate Division, reversing the lower court’s dismissal of the complaint, found that the abandoned structure presented the same kind of danger as an explosive *70 substance, inflammable material, live wire or spring gun. It declared that the city could be said to have violated a mandatory duty imposed upon it by statute to abate an inherently dangerous situation. It further found that even though plaintiffs were trespassers, they came within the class of persons intended to be protected. Citing Steitz v City of Beacon (295 NY 51, supra), the court declared (282 App Div 173, 178, supra): "A municipality may now be cast in liability on precisely the same basis as any individual who is obligated to discharge the governmental function involved and who fails in that duty, provided that the duty has been imposed for the benefit of the person injured by such failure.” The court expressly rejected the notion that municipal liability might be imposed in cases of acts of commission by the government but not as to acts of omission in the discharge of governmental functions. It stated (p 178): "the surrender of the sovereign immunity from liability with respect to a governmental function, is not limited to any acts of misfeasance or nonfeasance —commision or omission. The surrender is broad, general and unqualified. The only test of liability to be invoked now is that stated above, namely: Whether upon all the facts in the case an individual or private corporation would be liable for the breach if the governmental duty were imposed upon him or it.”
Upon being remanded for trial, the jury found in favor of the plaintiffs and against the City of New York. The cross complaint of the city against owners of the premises was dismissed, but the Appellate Division, while affirming as against the city, granted judgment over and against the building owners. This time the Court of Appeals voted five to one to uphold the judgment against the city and the homeowner despite the contention of the dissenter that the municipality should not be held liable in negligence for omission to exercise the police power.
The city was held to be subject to liability for failure to provide police protection under the circumstances in the case of Schuster v City of New York (5 NY2d 75). In that case, decided four to three, decedent had received threats on his life for having supplied information leading to the arrest of a well-known criminal and the police were notified. The issue presented was whether a municipality was under any duty to exercise reasonable care for protection under the circumstances. Rejecting the proposition that there could never be a *71 liability to the general public arising from a failure of police or fire protection, the majority held that there was, in fact, the governmental duty to take reasonable measures to assure protection citing a number of cases in which a municipality was held liable for negligent acts in the exercise of police power, including cases of nonfeasance rather than misfeasance (5 NY2d 75, 81-82). The concurring opinion held that it was immaterial that the city’s duty involved the discharge of a governmental function, and that once it assumed the duty of partial protection, that carried with it the obligation to exercise reasonable prudence in regard to the foreseeable risks engendered thereby. The question posed for trial was whether the dangers were reasonably foreseeable and/or contributed to in some measure by the city’s conduct — a danger enhanced by representations by city employees that there was no danger.
In Matlock v New Hyde Park Fire Dist. (16 AD2d 831), a plaintiff homeowner sought to recover damages from two fire districts for failure to extinguish a fire promptly. The Appellate Division, Second Department, reversed the lower court’s dismissal of the complaint which alleged that the house continued to burn while firemen of the various fire districts engaged in the dispute as to which of them had jurisdiction over the fire. The court, holding (p 832) that "[m]unicipal corporations are liable at least for negligent acts of commission in the exercise of governmental functions” as well as for "negligent omissions where its previous conduct gives rise to such a condition or state of affairs that its omission constitutes an injury rather than the mere withholding of a benefit”, reinstated the complaint. The majority declared that the complaint could fairly be construed to allege that not only did the fire department fail to extinguish the fire, but wrongfully prevented its extinguishment by others. The concurring opinion was premised upon the proposition that once having responded, the fire departments were duty bound to act carefully, just as police officers would be.
In Motyka v City of Amsterdam (15 NY2d 134, supra), a fire had been caused by a defective oil heater. A fire captain told the user to discontinue the use of the heater until it was repaired. The fire captain made no report to the Commissioner of Public Safety. The court held there was no liability for failure to see that the defect was corrected. It declared that liability could arise out of a situation only where disregard of the situation resulted in damage to one of the class to whose *72 benefit it was enacted. Tort liability to municipalities was said to exist only where there was a duty to use due care for the benefit of a particular person or class. Chief Judge Desmond dissented vigorously pointing out the numerous instances where governments have been held liable in damages for failure to provide police and fire protection, for failure to maintain traffic signals and failure to protect persons from the acts of mentally ill persons confined in institutions. He said forthrightly (p 141): "The time has come to remove from our law all the remaining vestiges of governmental immunity. We should be done with exceptions and incongruities. We should cut through the wilderness of special instances and say, as we did of hospital immunity in Bing v. Thunig (2 N. Y. 2d 656, supra), that municipal nonliability for injury-causing breaches of duty is archaic and unjust. Cities should be held to the same standards of conduct as apply to private persons, since risk of liability (and insurance against the risk) is incidental to municipal activities.”
The doctrine of Schuster was limited in the case of Riss v City of New York (22 NY2d 579). Like Schuster, plaintiff had received threats and notified the police, who refused to help. The next day, lye was thrown in her face blinding her. The majority opinion, per Bkeitel, J., distinguishes between government liability for activities comparable to private enterprise, such as transportation, hospitals and places of assembly, and governmental activities to provide service and facilities such as highways and public places, in which, concededly "ordinary principles of tort law” control, and those cases involving governmental services which protect the public. The court disavowed a general duty of protection as one which would dictate the allocation of limited resources without predictable limits. Schuster was held applicable only to those situations where the authorities undertook responsibility to particular members of the public and exposed them to unreasonable risks. The dissenting opinion by Keating, J., acknowledged Steitz, Motyka and Infosino, but declared (p 590) that cases like Runkel and Schuster signified the direction by which the law is proceeding "toward the day when the government, in carrying out its various functions, will be held equally responsible for the negligent acts of its employees as would a private employer.” He rejected the notion that although "sovereign immunity” had been abolished, it was being revived under the new form "public duty”, characterizing Motyka as a retreat.
*73 Smullen v City of New York (28 NY2d 66) bears some resemblance to the instant case involving as it does an inspector on the job who gave assurances of safety in a situation which was in fact unsafe, with dire results. In that case, the rules of the Board of Standards and Appeals, the Industrial Code and the plans approved by the city, called for the safeguarding of excavations over five feet deep by shoring of the soil. A city inspector on the site said to the decedent as he descended into the trench where it was 11 Vi feet deep, "It is pretty solid there” and "I don’t think it needs to be shored.” (28 NY2d 66, 69, supra.) The Court of Appeals, reversing the decision of the Appellate Division dismissing the complaint as against the City of New York, held that it was the inspector’s duty to inspect to see that the trench met safety requirements and that he had the power to stop the work. Agreeing with the cases which held that an inspector’s failure to ascertain the existence of a violation imposed no liability on the city (Young v State of New York, 278 App Div 997, affd 304 NY 677; Infosino v City of New York, 25 AD2d 841, mot for lv to app den 18 NY2d 583; Whitney v City of New York, 27 AD2d 528), the court held that here a blatant violation existed and the inspector wrongly adjudged the trench to be safe. The court declared Runkel and Schuster to be applicable "because of the city’s actual knowledge of the dangerous condition and its failure to do anything about it at a time when the inspector was directly on hand as the peril heightened.” (28 NY2d 66, 71, supra.) The court distinguished its earlier opinion in Motyka (15 NY2d 134, supra), where the statutory duty was held not to enure to the benefit of the injured plaintiff. The court in Smullen declared (p 72) that it was not required to determine whether a claim of liability could be predicated on the basis of mere inaction or passivity "in the face of the mortal danger so clearly apparent”, rather, the liability was triggered by the inspector’s positive action in assuming direction and control. The court observed (p 73) that what was involved was "not a case where the municipality has been found by a jury to be liable for a mere error of judgment on the part of an employee. All the evidence produced indicates that the inspector had really no occasion to make a judgment, so open and obvious were the violations.”
In Mazelis v Wallerstein (51 AD2d 579), the city appealed from a verdict against it in a case where plaintiff, a fireman, was injured when a building in which he was fighting a fire *74 collapsed on him. The evidence showed that the city had actual and constructive knowledge that the building was unsafe. Applying the principles of Runkel, the court found the city to be liable for its failure to comply with its Administrative Code provisions for unsafe and hazardous buildings.
Sanchez v Village of Liberty (42 NY2d 877) appears to be the most recent pronouncement on the subject of municipal liability. In that case, plaintiffs sued for wrongful death after a fire in a multiple dwelling. The complaint alleged that the building inspector was incompetent and that the building was in violation of certain statutes and ordinances. The Appellate Division found a cause of action against the village and its building inspector to exist, but in a brief memorandum, the Court of Appeals unanimously reversed, finding no special relationship existed for the class of persons which included the decedents requiring the municipality to enforce the applicable statutes and regulations. Unlike Runkel, in which the abandoned building was found to be in imminent danger of collapse, the building in Sanchez was found not to be "a dangerous instrumentality.”
A distillation of the principles underlying the appellate decisions permitting and denying recovery reveals no clear or comprehensive pattern — rather, it appears that cases are decided on a one-by-one basis with a rationale summoned up to fit the conclusion. Nevertheless, there are certain principles which seem to be established in utterance, if not in consistent application.
(1) The State or municipal government, having waived sovereign immunity, may be liable on the same general principles of tort liability as private individuals and corporations. This proclaimed doctrine of equality under the law in fact has limitations, for as exceptions are applied, it would appear that governments are "more equal” than the private sector. This may well be a reasonable and necessary exception to general rules of tort liability. While questions of harm, foreseeability and proximate cause would be identical whether the defendant be a public or private entity, the question of what is reasonable may indeed vary enormously in measuring private and public response. A private entity, dealing with a particular problem, product or location, can take reasonable precautions, the cost of which is not disproportionate to the risks presented. Government, on the other hand, assumes supervision and responsibility for vast segments of human life and *75 conduct. Foreseeable as some risks may be, it is manifestly unreasonable to call upon a government or one of its agencies to take all possible preventive action. The social and financial costs of affording such protection would be staggering, thus, the cases denying recovery for lack of police or fire protection, or for failure to conduct appropriate inspection.
(2) Recovery for governmental negligence, even in the area of protection and inspection, may be established when there is present an inherently dangerous or imminently hazardous condition. The duty to act is proportionate to the danger presented by failure to act. The more intense the danger, the greater the responsibility to act.
(3) The cases enunciate that no distinction is drawn between acts of omission and acts of commission — misfeasance and nonfeasance. A reading of the results might indicate otherwise. Recovery was denied in those cases like Steitz, Motyka, Riss, Infosino and Sanchez where the governmental failure was a failure to act. In Runkel, Schuster, Matlock and Smullen, the governmental agency had, in fact, taken some action, at least to the extent of responding to the scene or having the imminent danger made clearly apparent. Obviously, the mere failure to inspect, a duty enjoined by statute, will give rise to no liability because of the manifest impossibility of the government agency being everywhere and anticipating everything.
(4) Where there is more than a generalized duty to inspect or protect, i.e., where the government agency has had its attention drawn to the hazardous situation, then liability may be imposed for knowing the danger and ignoring it, or failing to take appropriate follow-up action. That is the distillation of the decisions in Runkel, Schuster, Matlock, Smullen and Mazelis. Although in Riss, Motyka and Sanchez, a government agency or employee was on notice of the dangerous or defective condition, those cases were decided on the basis of reasonableness of response for classes of persons to whom the duty to act was owed.
(5) Where the danger presented is open, obvious and blatant, the responsibility of the governmental agency is increased manyfold. Thus, in Smullen, although the city inspector believed the conditions to be safe, they were so manifestly unsafe as to warrant imposition of liability. In Riss, however, unlike Schuster, the danger did not appear to the police, as the agency charged with protection, to be as imminent and *76 pressing as in Schuster (although reasonable men might differ on the foreseeability of that risk). An open trench, as in Smullen, or a building in danger of imminent collapse as in Runkel, calls for immediate government action. The danger to inhabitants of a building because of inadequate exits, as in Sanchez, presents a real danger, but evidently not one of such pressing urgency.
(6) The duty of the government to act is consonant with its power in areas such as police and fire protection, building inspection, road design and maintenance, etc. The official agency is vested with a unique power. While others, private individuals or corporations, may have the power to correct, modify or rectify a dangerous condition, it is usually only an agency of government which has the power to bring all activity to a halt — to enjoin, to refuse to license, to require cessation of all work, or even to compel demolition. Private individuals necessarily rely upon the government in its exercise of that ultimate power. When the government, which is clothed with that power declines to exercise it, it is giving assurance, implicit or explicit, that the condition is not really dangerous and that it is safe to proceed. Such reassurance, falsely given, may be a predicate for liability.
(7) Echoing the fears as to the imposition of widespread government liability, the court in Moch Co. v Rensselaer Water Corp. (247 NY 160) sought to limit recovery only to those to whom a specific duty had been undertaken. Steitz, Motyka and even Smullen speak in terms of a duty owed to a particular person or class of persons rather than a duty running to the public at large. Quaere whether this is still a viable distinction. In Runkel the injured persons were trespassers, but nevertheless the city’s duty to inspect was said to be designed to protect them as well. Yet, in Motyka, it was stated that a person using a defective oil heater was not in the class of persons to be protected by a responsibility to see that the defect was corrected. In Smullen, the duty of the inspector with respect to the safety of the trench appears to have been based upon the fact that there was a direct relationship between the inspector and the decedent, who was the recipient of the inspector’s assurances of safety. I cannot really believe that a duty of protection owed to the public at large is in effect a duty to no one in particular. It is the inhabitants of buildings who are to be protected against fire or against building collapse; it is any person within the ambit of foresee *77 able hazard who is entitled to the protection afforded by statutes and regulations designed to abate that hazard. The notion that there must somehow be a direct relationship between the government agency and plaintiff before recovery can be permitted is a strange one. Indeed, the notion that the duty to protect or inspect runs only to a particular person because of a pre-existing relationship with the governmental agency is a doctrine which is redolent of privity. It took many years in the development of tort law before the citadels of privity were breached in connection with the law of warranty and products liability. Strangely, the implication appears to arise that privity is somehow to be a requirement for recovery in dealing with municipal tort liability. A public duty runs to all persons who may be expected to fall within the penumbra of danger. Expectation is the very stuff of duty. Members of the public, using facilities purportedly found safe by government agencies should be entitled to redress in the event that negligent failure by such agencies has unreasonably exposed them to the risk of harm. No direct or special relationship should be required. In Smullen, the liability should have followed because of the egregious negligence of the city inspector whether he spoke directly to the decedent or not. Would it make sense in this case to hold that a special relationship was required so that if the city inspector assured the plumber of the safety of the installation, and it was not safe, the plumber who was injured might be able to recover (assuming no or minimal contributory negligence) while the innocent members of the public could not? This would appear arrant nonsense. The public duty is imposed for the benefit of the public and should not be subject to special and exotic limitation. When a government agency possesses the expertise and the information sufficient to apprise it of impending danger, the duty to act with respect to that danger becomes imperative. A failure to do so gives rise to tort recovery.
The application of these principles to the instant case is (thus seen as) ample justification for the recovery awarded by the jury to the plaintiffs as against the city. Section C261606.1 et seq. of the Administrative Code provided that the blue card authorizing the gas hook-up should be issued only when the gas piping complied with the applicable provisions of the code. We are not presented in this case with a mere failure by the city agency to inspect or by a failure of the inspector on the scene to observe latent and hidden defects. *78 Here, undeniably, the agent of the city was on the scene. He was explicitly charged with the legal responsibility for ascertaining that the pipes were safe. An open-ended gas pipeline, such as existed here, was a standing invitation to disaster. The danger prsented by defective gas piping of such a nature was extraordinary. Catastrophe was not merely foreseeable— it was inevitable. Yet, in the face of a situation where the danger was even more blatant and obvious than in Smullen, the city inspector ignored the open-ended pipes, failed to observe or ignored the lack of a basic shut-off valve at the point of entry of the gasline, and commended the inexperienced plumber for a job well done. He was here giving more than passive acquiescence to the condition. When he told the plumber, who relayed the information to the restaurant proprietor that the blue card would issue, he not only gave assurances of safety upon which laymen, and even a sophisticated utility were entitled to rely, but he virtually guaranteed that the forces would be set in motion which eventuated in the explosion. Approving the issuance of the blue card was tantamount to giving the direction "Go ahead! Turn on the gas.”
While it may not have been foreseeable that the gas would be turned on by an interloper rather than by Consolidated Edison, it was certainly foreseeable that once the gas was turned on by anyone, it would flow out the open end and that any spark would provide ignition for conflagration. The action of the city’s representative, under the circumstances, was irresponsible in the extreme. It was he, by his improper assurances of safety, who set the forces in motion which led in an unswerving line to the disaster that ensued. He had to know of the improper installation — it was his job — and he was derelict in carrying out his duties. Every member of the public who was endangered once that gasline was put into operation, whether a tenant of the premises, an employee, a customer or a passerby, was predictably and foreseeably endangered.
If a municipality can be compelled to respond in tort for holes in the sidewalk which have not been remedied or for snow and ice which have not been removed, by that logic, should it not be responsible when it permits a flow of explosive gas without the means for direct cut-off? If a government could be held liable in tort for having failed to keep dangerous inmates who are incarcerated from escaping, should it not equally be liable for permitting dangerous gas to escape from *79 a pipeline? The questions themselves would appear to provide the answers. There is nothing unusual or untoward in permitting the injured members of the public to recover for the gross dereliction of duty which the jury had found by its verdict.
The jury on the first trial also found the city liable to the plaintiffs. On the basis of the facts presented, common sense and common expectation should so indicate. Only the sophistication of the law provides obfuscation for what should be readily apparent. Indeed, on the appeal to the Appellate Division after the first trial, that court, while setting aside the jury’s verdict as against the city, did not do so on the grounds that the city was insulated from liability because it was enshrouded with a special governmental immunity. If that had been the case, the appellate court would not have sent the case back for a further trial with respect to the city’s liability. If that is not the law of the case, because the original judgment against the city was vacated, then it is something pretty close to it. In any event, this court concludes that on the merits, based upon the facts presented to the jury and the law as enunciated by the courts of this State, the jury verdict of liability as against the city was fully warranted. The motion to set aside that verdict is denied.