OPINION OF THE COURT
Edward J. Greenfield, J.
In the late afternoon on August 3, 1973, a portion of a building known as the Broadway Central Hotel at 673 Broadway in Manhattan collapsed. Four persons were killed in the wreckage, many others were hurt and a number of businesses sustained substantial property damage giving rise to the 43 consolidated actions at bar. Named as defendants were, among others, the owners of the building, the net lessee, the mortgagee, a tenant who was having structural renovation done on its portion of the premises and the contractor it employed for that purpose. Also named as a defendant is the City of New York, whose Department of Buildings had been made aware of the hazardous state of the building and had failed to act to cause the defect to be remedied or the building to be vacated. Thus, the case raises both factual and legal questions as to the responsibility for the disaster and the court must apportion the liability among those responsible.
*83 The building was originally constructed as a luxury hotel in the 1850’s, and had undergone various alterations over the years. Originally, it was known as the La Farge House. Adjoining it was a theatre known as Tripler Hall. When damaged by fire in 1854, it was reconstructed and enlarged from its original six stories and was enlarged further in 1869. It was renamed the Grand Central Hotel and finally the Broadway Central Hotel. In its halls appeared James Fenimore Cooper, Daniel Webster, William Cullen Bryant and William Thackeray. The great actor, Edwin Booth made his debut there and his infamous brother, John Wilkes Booth, also trod its stages. The National Baseball League was organized there in 1876. There Edward Stokes vied with tycoon James Fisk for the affections of Josie Mansfield, and Stokes shot and killed Fisk on the grand stairway of the hotel. Later, in its restaurant, once worked a Russian émigré, Leon Borenstein. When he returned to Russia, he took the name of the restaurant for his own — Trotsky.
The addition to the hotel fronting on Mercer Street was of different architecture than the original portion fronting on Broadway. The Broadway building had brick walls which bore the weight of the entire structure. The Mercer Street side was constructed with iron columns.
By the 1970’s, the hotel, and the area in which it was situated, had seen better days. Broadway and Mercer Street was no longer the hub of activity in New York. However, there were those who saw in the old hotel an opportunity for revival. Among these was the Mercer Arts Center, Inc., whose president was Seymour Kaback. The center had leased some 35,000 square feet on the first and second floor of the hotel and had an ambitious project for setting up a cultural complex to include off-Broadway theatrical productions, films, dance, music and poetry. The old restaurant and catering establishment was to be replaced by cabarets and theatres. A theatrical bar and nightclub were planned as well as several acting schools.
As part of the extensive renovations for the Mercer Arts Center, air conditioning ducts were to pass through the weight bearing walls and a steel beam was installed to replace the original wood beams and to correct sagging ceilings. As an exit from the cabaret, an opening for a door was made through the second bearing wall. This work had largely been finished one year before the collapse of the building.
*84 The structure which carried the weight of the beams and the floors on which they rested was a brick wall running parallel to Broadway for 80 feet. That brick structure, held together by lime mortar, was 16 inches thick on the bottom and 12 inches thick on the top. Fronting the brick weight bearing wall was a facade of brownstone four inches thick, keyed into the brickwork. In addition, there were weight bearing walls running at right angles to Broadway in an east-west direction.
As early as 1970, falling plaster and cracks in the second interior weight bearing wall, which ran in an east-west direction, had been noticed. Mr. Wright, the managing engineer of the building, noted that the crack began on the eighth floor and extended all the way down diagonally to the third floor. This was a crack that extended through the entire thickness of the weight bearing wall, widening to as much as three or four inches. The crack was plastered over, but within six months it had opened again and was pushing even further. Then, as the shifting weight of the building settled on walls and ceilings, complaints about doors being stuck and not working became more and more frequent. Joseph Cooper, manager of the hotel, admitted that he had received complaints about the cracking walls. There was also some bulging of the Broadway wall which by 1973 had protruded further. Cooper reassured Wright that the cracks were nothing to worry about.
In January of 1973, Mr. Kaback of the Mercer Arts Center noticed the cracks extending through the interior bearing wall and buckling the frames of the double doors going through it. He called it to the attention of Cooper and Wright and had his own contractor and architect inspect it. Architect Lee Schoen and Jack Shafran of Ambassador Construction Company, Inc., both viewed the crack going through the weight bearing wall and concluded that the cracking represented a structural danger. Shafran contacted Larry Clark, the chief building inspector for the Borough of Manhattan, who personally inspected the premises on January 29, 1973. Clark observed the bulging of the exterior wall and the diagonal crack through the weight bearing wall. Shafran considered the separation in the weight bearing wall to be dangerous and Chief Inspector Clark agreed that as a result of this very serious defect in the bearing wall, pressure was being exerted eastward to the Broadway wall. He told the hotel manager that an architect *85 or engineer should take immediate remedial action. While he concluded that the building was not in imminent danger of collapse, he did agree that if the condition were not remedied it would grow steadily more dangerous. He did not, however, check out the crack or observe that it extended all the way up to the eighth floor. He did not issue any violation with respect to the crack in the weight bearing wall and made no personal effort to follow-up. On February 22, 1973, a violation was issued on the building, but it related only to the bulging front facade and made no mention of the cracked weight bearing wall.
Manager Cooper called in consulting engineer Alvin Fisher, who was shown the bulge and crack in the front wall but does not recall having the cracks in the weight bearing wall pointed out to him. After the violation was placed on the building with respect to the front wall, he proposed several plans for correcting the condition and stated that the lessees of the hotel opted for the cheapest solution. He submitted three or four plans to the Department of Buildings to fix the front wall. This was in May of 1973. His plans were disapproved. Further plans were submitted, but up to the date of the collapse no plans to remedy the violation were approved.
Harry M. Sadler, a civil engineer called as an expert witness, concluded that the cracking in the weight bearing wall was a serious structural failure of such danger that the building should have been vacated. It was his opinion that any prudent engineer should have "blown the whistle.” Phillip E. Olin, Kings County Borough Superintendent of the Department of Buildings and a member of the board of inquiry convened by it to investigate the collapse, concluded that the failure of the city building inspectors to write a conprehensive building order on the day the bearing wall cracks were observed, and to have made no explicit mention of it in the violation order, was a departure from proper procedure. A hazardous building violation could have resulted in a court order for immediate repair within 10 days. If the building were found to be in imminent danger of collapse, it would be vacated immediately.
Unfortunately, however, the violation which was later issued did not refer to the cracking of the weight bearing wall and the architect engaged by the hotel management made no plans to remedy that condition. Even his limited plan to fix the bulging Broadway facade was not acted upon by the *86 Department of Buildings and, of course, no work on structural renovation could commence without the Department of Building’s approval.
By July of 1973, particles of brick and dust were falling more frequently. More door frames were pushed out of line. On Friday, August 3, 1973, building engineer Wright noted there was pressure on the sprinklers, and crackling sounds within the building. Then there were rumbling noises to be heard. Kaback advised Manager Cooper to evacuate the building. At 4:30 p.m., Kaback called the emergency services of the building department and was told to call back again on Monday. He then called the police and fire departments, but they refused to come since nothing had happened. Telegrams were sent to the hotel and to Mr. Edwards, who represented the owners. He then attempted, himself, to get the building evacuated. At 5:10 p.m. there was an explosive sound and the southeast portion of the building collapsed. Lights went out and as the sprinkler pipes broke, water started gushing. Ten to fifteen minutes later, there was a further explosive collapse. Four persons were killed and many were injured. Considering the size and use of the building, the tragedy could have been worse. There were 380 rooms in the building and a number of business enterprises. The Mercer Arts Theater and Cabaret, as well as the other facilities, could have accommodated up to 3,000 people. Had the collapse been a few hours later, when the public was present, the casualties could have been staggering.
At and prior to the trial, claims against various of the named defendants were dismissed or discontinued. As to the rest, the parties having waived formal findings of fact and conclusions of law except insofar as contained in the opinion of the court, the court will now discuss the liability.
I
MATILDA EDWARDS AND GERTRUDE LATHAM
Up to April of 1969, title to the premises was held by the Washington Square Hotel Corporation. At that time, pursuant to a plan of liquidation, title was transferred to Matilda Edwards, Gertrude Latham and the estate of Anna Klein. The latter’s interest was then purchased by Mrs. Edwards and Mrs. Latham. The premises were leased under a net-lease to the 673 Village Corporation, which in December, 1969, trans *87 ferred its leasehold to defendant 667 Hotel Corporation, with the consent of Matilda Edwards and Gertrude Latham.
The Multiple Dwelling Law imposes upon an owner (which is defined to include a lessee directly or indirectly in control of the premises) a duty to keep every part of the premises in good repair. (Multiple Dwelling Law, § 78.) The testimony clearly established that the hotel was a multiple dwelling and this fact is conceded by the owners, Matilda Edwards and Gertrude Latham.
The duties imposed by section 78 are nondelegable (Rogers v Dorchester Assoc., 32 NY2d 553); however, the owner or a lessee is not the insurer of the safety of persons and property upon the premises. Fault and actual or constructive notice of the defective condition must be shown in order to impose liability under section 78. (See Torres v United States, 324 F Supp 1195 [and cases cited therein at pp 1198-1199].) Thus, an owner will not be held liable where he has so completely parted with possession and control that he cannot perform the duty to keep the premises in good repair. However, the burden is on the owner to make such a showing. (Fochtman v Gilman, 9 AD2d 904.)
The owners in this case did not sustain this burden. To the contrary, the evidence established that the owners retained sufficient control to subject them to liability. Although the premises were under a net lease, the owners had a right to enter and inspect the premises and make repairs, thus retaining sufficient control to subject them to liability. (Appel v Muller, 262 NY 278; Weiner v Leroco Realty Corp., 279 NY 127.)[1]
Moreover, the evidence supports a finding that the owners had constructive, if not actual notice of the dangerous condition. As noted above, cracks in the bearing wall were evident as early as 1970, and by early 1973, the crack had widened and extended to the second floor. Owners of a building cannot absolve themselves of liability by failing to avail themselves of *88 their contractual right of access and then claim that they did not have notice of condition. Where, as here, the owners have the right to enter the premises and make repairs, the continued existence of a dangerous condition, which the evidence established was actually known to the net lessee, justifies a finding that the owners had constructive notice of the condition. (Tkach v Montefiore Hosp. for Chronic Diseases, 264 App Div 135, affd 289 NY 389.)
In addition, there was evidence that Mr. Edwards, defendant Matilda Edwards’ husband, had actual notice of the condition. Mr. Edwards, who acted on behalf of the owners on more than one occasion, may be considered their agent, at least for purposes of notice. Based on the foregoing, the court finds the owners liable.
II
667 HOTEL CORPORATION
667 Hotel Corporation, as the net lessee of the premises, in addition to having an obligation of reasonable care (Putnam v Stout, 38 NY2d 607), had the right under its lease and, in fact, had convenanted to make repairs to the building.
Although the net lessee engaged architect Alvin Fisher two days after Mr. Clark’s inspection, this did not fulfill the lessee’s duties. No repairs were undertaken and plans were not even filed until May of 1973. Although Mr. Fisher testified that he was called again in April, probably in connection with a violation that was issued in February concerning the bulge on the Broadway facade, no plans for any repairs were submitted until May 2, 1973. Moreover, Mr. Fisher testified that the plans were filed simply to gain time, since it was not expected that they would be approved. In addition, based on the testimony adduced at trial, had any of Mr. Fisher’s plans been implemented, the collapse would not have been prevented. Accordingly, the court finds that the net lessee is also liable. Neither the owners nor the net lessee can avoid liability because the Department of Buildings admittedly issued a defective violation in February which only referred to the facade of the building and made no mention of the second bearing wall.
III
FIRST FEDERAL SAVINGS & LOAN ASSOCIATION
First Federal Savings & Loan Association (First Federal), *89 which held a mortgage on the premises, is named as a defendant in only four of the 43 actions. The plaintiffs in these actions contend that First Federal can be held liable because it received a collateral assignment of the lease between defendant Washington Square Hotel Corporation and 673 Village Corp. as additional security for the mortgage debt. Plaintiffs’ theory is that by reason of the collateral assignment, First Federal had sufficient ownership, management or possession and control to subject it to liability. The court disagrees. The assignment specifically provided that: "it is mutually agreed that: 1. So long as there shall exist no default by Assignor in the payment of any indebtedness secured hereby or in the performance of any obligation, covenant or agreement herein, or in Consolidated Mortgage contained, Assignor shall have the right to collect upon, but not prior to accrual, all rents, issues and proñts from said leased premises and to retain use and enjoy the same.” Furthermore, the assignment expressly provides: "Nothing contained in this Assignment shall impose or create any obligation or liability whatsoever, expressed or implied upon [First Federal] with respect to or in any manner arising out of the lease assigned as security herein. [First Federal] shall not be obligated to perform or discharge nor does it hereby undertake to perform or discharge, any liability under said lease, or by reason of this assignment”.
The evidence adduced at trial showed that the mortgage payments were current and that First Federal neither became a mortgagee in possession nor assumed possession or control of the premises. Although under the Multiple Dwelling Law, a mortgagee in possession is obligated to keep the premises in good repair, no similar requirement exists solely by reason of a mortgage.
The liability of an owner or a person in possession is predicated on fault. If a person has no opportunity to correct the defect, he cannot be held liable. Until a default, a mortgagee has no opportunity, much less an obligation, to keep the premises in good repair. Moreover, the assignment at issue specifically limits the mortgagee’s rights until there was a default by the owner. As noted above, there was no evidence of any default. If First Federal had attempted to enter the premises to make repairs, it would have subjected itself to damages in trespass or to treble damages (Real Property Actions and Proceedings Law, § 851; Dime Sav. Bank of Brook *90 lyn v Altman, 249 App Div 174, affd 275 NY 62). Accordingly, First Federal is entitled to judgment dismissing the claims asserted against it.
IV
CITY OF NEW YORK
Plaintiffs seek to predicate liability against the City of New York based upon the failure of its Department of Buildings to enforce the provisions of the Administrative Code of the City of New York, to take the necessary steps to safeguard the occupants of the building, to review and cause the filing of plans so that work could proceed on the necessary structural renovations, and upon its ignoring accurate prediction of imminent disaster and taking no action thereon.
It is conceded that on January 26, 1973, the Department of Buildings was advised of a crack in the second interior bearing wall. On the following day, Chief Inspector Clark conducted an inspection of the building in the company of the hotel’s manager, Mr. Cooper. Despite the fact that in his opinion, the cracks and bulge on the Broadway facade constituted a dangerous condition, he did not issue an order requiring that the wall be repaired.[2]
Another inspection was conducted on February 22, 1973 by Inspector Shafner who found that no repairs had been made. Inspector Shafner issued an order, marked hazardous, requiring immediate restoration of the facade of the building to a safe condition; however, the order made no reference to the bearing wall. After a reinspection on March 22, 1973, which showed that the order had not been complied with, criminal proceedings were commenced against the net lessee and Mr. Edwards. However, despite the danger presented by the structural defect in the second interior bearing wall, the city did not avail itself of the Administrative Code provisions specifically designed to assure that a dangerous condition is reme *91 died[3] and/or that the building is vacated.[4] When the Department of Buildings was notified on the day of the collapse that tremors could be felt in the building, its personnel advised Kaback to call again after the weekend. The police and fire departments also failed to respond.
Although the record is more than sufficient to support a finding that the city acted unreasonably under the circumstances, the city argues that the claims against it must be dismissed because a municipal corporation is not liable for a failure to perform what is known as a general protective function, i.e., a failure to provide general police or fire protection (Riss v City of New York, 22 NY2d 579; Stranger v New York State Elec. & Gas Corp., 25 AD2d 169). In the area of inspection and protection, recovery is denied in certain cases and allowed in others. The enunciated theory has been that there is no municipal liability absent some special duty owing to a particular person or class. (Sanchez v Village of Liberty, 42 NY2d 876.)
It is clear that the courts of this State have been reluctant to impose liability on a municipal corporation or other political subdivision of the State for failure to enforce what may broadly be considered as safety statutes, i.e., fire, health and building codes, although the results have been severely criticized.[5] That reluctance is premised on the fact that it is *92 unreasonable to hold a municipality to account every time a citizen is a victim of a crime, of a fire, of a building collapse or of an explosion. As this court recently had occasion to observe in Gannon Personnel Agency v City of New York (103 Misc 2d 60, 67, 68): "Theoretically omniscient and omnipotent, the municipality is, in fact, neither. It observes and it acts through the eyes and presence of an always inadequate number of personnel. It cannot possibly station them every place they should be, nor can it possibly inspect every site that needs inspection. * * * No municipality may be held liable for every citizen victimized by crime because police protection was stationed elsewhere. No citizen may successfully sue because damage or injury was sustained in a defective building or installation which city inspectors had not gotten around to checking it out.”
That does not mean that the city is totally insulated from liability. Under appropriate circumstances, it may be answerable for its acts of negligence in failing to carry out its governmental functions of inspection and protection.
Although the waiver of sovereign immunity by the State removed the bar to actions against the State and every political subdivision for the wrongs of its officers and employees (Steitz v City of Beacon, 295 NY 51; Bernardine v City of New York, 294 NY 361) thus making the State and every political subdivision liable in accordance with the same general principles applicable to individuals and corporations (Steitz v City of Beacon, supra), it appears that municipalities are "more equal” than private citizens.
Despite the denial of recovery in the Steitz case, it should be noted that the court equated the duty of a municipality with that of an individual and held that the same general principles should be considered applicable. Despite this, there are appellate cases which deny recovery against a municipality which has failed to act upon notice, constructive or actual, of a potentially hazardous situation.
As all the cases are commented upon and analyzed in Gannon Personnel Agency v City of New York (103 Misc 2d 60), there is little point in reviewing the authorities once again.
A distillation of the principles set forth in the reported cases, while indicating that recovery or its denial is on a case by case ad hoc basis, nevertheless leaves us with certain governing rules:
*93 (1) The State or municipal government, having waived sovereign immunity, may be liable on the same priniciples of tort liability as private individuals and corporations. What is reasonable for a private entity may involve different considerations insofar as public response is concerned.
(2) There may be a recovery for governmental negligence in the area of protection and inspection when there is actually brought to the attention of the municipal authorities an inherently dangerous condition. The greater the danger, the greater the responsibility to act.
(3) Insofar as municipal liability is concerned, there is no distinction drawn between acts of omission and acts of commission. While the mere failure to inspect will give rise to no liability, a failure to take reasonable action once there has been an inspection which calls the hazardous condition to the attention of the authorities will give rise to the liability.
(4) Liability will follow when the municipality knows of the danger and fails to take reasonable steps to abate it as in Runkel v City of New York (282 App Div 173), Runkel v Homelsky (286 App Div 1101, affd 3 NY2d 857), Schuster v City of New York (5 NY2d 75), Matlock v New Hyde Park Fire Dist. (16 AD2d 831), Smullen v City of New York (28 NY2d 66) and Mazelis v Wallerstein (51 AD2d 579).
(5) When the municipality is invested with a unique power to act, and not merely to supervise, or to approve or disapprove the actions of others, its responsibility is heightened. When the governmental agency has the power to bring the activity to a halt or, as in this case, to require renovations, to license structural changes (without which approval no private action could take place), to vacate a building or to compel demolition, liability should be imposed for a failure to exercise that unique and ultimate power. In situations where private individuals, however willing, are unable to proceed without governmental action, the failure of the government to act may be a predicate for liability.
While some of the cases refer to municipal liability existing only when there is a special duty to act owed to a particular person or class, as in Gannon this court questions the validity of that distinction. Does it make sense to say, as in Runkel, that trespassers may recover for a building collapse, but the inhabitants of the building may not? Is not any person who will be affected by forseeable harm entitled to the *94 protection of municipal regulations designed to abate that hazard.
"The notion that there must somehow be a direct relationship between the government agency and plaintiff before recovery can be permitted is a strange one. Indeed, the notion that the duty to protect or inspect runs only to a particular person because of a pre-existing relationship with the governmental agency is a doctrine which is redolent of privity. It took many years in the development of tort law before the citadels of privity were breached in connection with the law of warranty and products liability. Strangely, the implication appears to arise that privity is somehow to be a requirement for recovery in dealing with municipal tort liability. A public duty runs to all persons who may be expected to fall within the penumbra of danger. Expectation is the very stuff of duty. Members of the public, using facilities purportedly found safe by government agencies should be entitled to redress in the event that negligent failure by such agencies has unreasonably exposed them to the risk of harm. No direct or special relationship should be required * * * When a government agency possesses the expertise and the information sufficient to apprise it of impending danger, the duty to act with respect to that danger becomes imperative. A failure to do so gives rise to tort recovery.” (Gannon Personnel Agency v City of New York, 103 Misc 2d 60, 77, supra.)
In the instant case, the city was alerted to the open obvious danger posed by the structural defect in the second interior bearing wall and yet did not comply with section C26-80.0 of the Administrative Code directing that the premises be made safe or torn down. Even under the duty/special duty analysis, there is clearly more than the failure to comply with a generalized duty as the clear and imminent danger was brought to the attention of the city. The actual and imminent danger that the hotel, or a portion thereof, would collapse was blatant. One of the city inspectors, realizing the severity of the danger, called in the borough superintendent. He immediately recognized the danger, but no follow-up inspection was taken. Under these circumstances, the city may be held liable.[6]
*95 Apart from the city’s failure to enforce the Administrative Code, liability may also be predicated on the dangerous instrumentality theory first advanced in Runkel', where the court found that an abandoned open building which was so rotted and dilapidated as to be in imminent danger of collapse was held to constitute a trap or an inherently dangerous instrumentality in the same class, for example, as an explosive substance, so that injury occasioned thereby could be considered to have been caused by wanton or intentional acts of the one responsible for its existence or removal so as to cast him in liability.
Whether this case is viewed as coming squarely within the holding of Runkel, or as a case where there is more than a generalized duty because of the city’s knowledge of the dangerous condition, liability must follow. Here we have an occupied building with a dangerous structural defect, which could only get worse. The building was clearly a trap for its inhabitants and anyone else who came near the premises. The city not only failed to act to abate the danger, but its inspector issued a violation referring only to the bulge on the Broadway facade. The situation is somewhat analogous to that presented in Smullen v City of New York (28 NY2d 66, supra) where a sewer inspector, in the face of a clear violation requiring a trench to be shored up adjudged the trench to be safe. As the court in Smullen, we are not required to determine whether mere inaction in the face of mortal danger so apparent can support a claim of liability. Although as noted in Gannon, an analysis of the cases does not support the conclusion that an act of commission is required for imposition of liability, in the case at bar, we have more than mere inaction. We have the issuance of a defective violation which may be deemed to have aggravated the situation, for the hotel man *96 agement’s architect claims never to have been made aware of the bearing wall defect. As Judge Cardozo noted in Moch Co. v Rensselaer Water Co. (247 NY 160), if conduct has gone forward to such a stage that inaction would commonly result, not negatively in merely withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. Here the city was specifically advised of the danger by a tenant, verified that the dangerous condition in fact existed, and then initially failed to issue a violation. When it finally took some action, it issued a violation which referred solely to the bulge.
 While it is reasonable to shield a municipality from a liability based on a breach of its generalized duty to inspect or protect, once it became aware of the open and obvious danger, it has a duty to act and is required to carry out its responsibilities in a prudent manner, exercising due care with respect to those who will be immediately affected by its action, which it clearly failed to do. (Matter of Alva S. S. Co. v City of New York, 405 F2d 962, citing Matlock v New Hyde Park Fire Dist., 16 AD2d 831, supra.)
Where, as here, a government agency possesses the expertise and the information sufficient to apprise it of impending danger, the duty to act with repsect to that danger becomes imperative. A failure to do so gives rise to tort recovery.
The responsibility of the city for its total lack of action in the face of danger is heightened by the fact that even on the day of the collapse, when there was still an opportunity to vacate the building and to prevent personal injury, loss of life and to some extent damage to removable property, the city failed to act. The building department, the fire department and the police department all shrugged off responsibility and despite private efforts, disaster followed. If ever there was a basis for the imposition of municipal liability, the facts in this case call for that result.
Insofar as the apportionment of liability is concerned, the court concludes that had the city issued an appropriate violation to remedy the defective structure or had it commenced an unsafe building proceeding, much of the property loss still could not have been prevented. The court concludes that so far as the death or personal injury claims are concerned, apportionment of liability should be as follows: the owners— 25%, the net lessee — 45% and the City of New York — 30%. With respect to the property damage claims by tenants of the *97 building, the city’s liability is limited to damage to that property which could have been removed had the city taken appropriate action at an early stage.
Where certain of the plaintiffs have sued only one or two of the defendants held liable, the named defendants shall be responsible for 100% of the loss in the proportion that their responsibility bears to each other. In addition, the owners are entitled to indemnification from the net lessee in all cases where such a cross claim has been asserted (Hogeland v Sibley, Lindsay & Curr Co., 42 NY2d 153), and the City is entitled to indemnification from the owners (Mazelis v Wallerstein, 51 AD2d 579, supra).

. It is of note that under the lease in question, both the owners and the net lessee were previously held liable for a dangerous condition on the premises (Lieberman v Washington Sq. Hotel Corp., 673 Vil. Corp., 40 AD2d 647). That the owners had the option to serve a demand on the lessee if it failed to make repairs (the lease uses the word “may”) cannot be construed to preclude them from making repairs without such notice. Although the net lessee covenanted to maintain the premises in good repair, the lease specifically provides that the owners may enter the premises at all reasonable hours for the purpose of inspection "or of making repairs that tenant may neglect or refuse to make.”

. Section D26-54.01 of the Administrative Code provides in pertinent part that: "a. Whenever the department determines that because of any violation of this title or other applicable law, any dwelling or part of its premises is dangerous to human life and safety or detrimental to health, it may * * * (2) order the owner of the dwelling or other responsible party to correct such conditions * * * c. An order issued pursuant to the preceding subdivisions shall state the violations involved and the corrective action to be taken, and shall fix a time for compliance, which shall be not less than 21 days from the date of service of the order, except that where a condition dangerous to human life and safety or detrimental to health exists or is threatened, a shorter period for compliance may be fixed.”

. "§ C26-80.0 Removal or repair of structures — Any structure or part of a structure or premises that from any cause may at any time become dangerous or unsafe, structurally or as a fire hazard, or dangerous or detrimental to human life, health or morals, shall be taken down and removed or made safe and secure”.
In addition, where a building is dangerous to human life, the Administrative Code sets forth various actions that can be taken by the department. The dwelling can be declared a public nuisance, after a hearing, and the department may then order such nuisance to be removed pursuant to article 54 or may bring an action for an order compelling owner(s) to repair. (Administrative Code, § D26-50.ll.) The department may also seek to have a receiver appointed to effect repairs where the condition is such that unless immediately cured irreparable damage to its occupants may be caused or it constitutes an imminent danger (D26-55.07). Resort to judicial process is the usual means of enforcement.

. "§ D26-56.01 Power to order dwelling vacated — a. Any dwelling or part thereof, which, because of a structural or fire safety hazard, defects in plumbing, sewage, drainage, or cleanliness, or any other violation of this code or any other applicable law, constitutes a danger to the life, health, or safety of its occupants, shall be deemed to be unfit for human habitation.
b. The department may order or cause any dwelling or part thereof which is unfit for human habitation to be vacated.”

. See, e.g., dissenting opinion of Keating, J., in Riss v City of New York (22 NY2d 579, 583-584, supra); Lloyd, Muncicipal Tort Liability in New York, 23 NYUL Rev, 278 293-296.

. The court is cognizant of the fact that the courts of this and other jurisdictions, have found a special duty only in instances where the building or place in question is not open to the public and the complained of violation is inherently dangerous. (See note, Municipal Liability for Negligent Inspection, 23 Loyola [New Orleans] L Rev *95 458, 479 and cases cited at pp 467-478.) Both Runkel and Mazelis involved abandoned buildings. In Sanches v Village of Liberty, although the lack of adequate ingress and egress clearly presented a danger and a nuisance, the Court of Appeals held that no liability could be imposed on the city. In Dufrene v Guarino (No. 563-969, affd 343 So 2d 1097, cert den 343 So 2d 1069), the owners of a lounge had been notified of numerous fire code violations, but the city allegedly failed to make a follow-up inspection as required. In affirming dismissal, it concluded that the city’s duty to inspect was a duty owed to the general public. The underlying basis for the distinction, although unspoken, would appear to be the financial burden that a finding of liability would impose on a municipality, however, the extent of the financial burden should not be the determining factor. If the city is liable for failure to tear down an abandoned building in imminent danger of collapse, it should also be liable where the building is occupied.